**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**ASHLAND, LONDON AND LEXINGTON DIVISIONS**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | **Chapter 7** |
| **LICKING RIVER MINING, LLC**, *et al.* | : | **Case No. 14-10201** |
| | : | **Jointly Administered** |
| **Debtors** | : | |
| _____ | : | |
| | : | |
| **Phaedra Spradlin, not individually but as** | : | |
| **Chapter 7 Trustee for Debtors Licking** | : | |
| **River Mining, LLC, Licking River** | : | |
| **Resources, Inc., S.M&J., Inc., Fox Knob** | : | |
| **Coal Co., Inc., J.A.D. Coal Company, Inc.,** | : | |
| **U.S. Coal Corporation, Harlan County** | : | |
| **Mining, LLC, Oak Hill Coal, Inc., Sandlick** | : | |
| **Coal Company, LLC, and U.S. Coal** | : | |
| **Marketing, LLC,** | : | |
| | : | **Adv. No. 16-1040** |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **LINDA WHITT, STEPHANIE LACY,** | : | |
| **AND MELISSA LEWIS,** | : | |
| | : | |
| **Defendants** | : | |
| _____ | : | |

**MEMORANDUM OPINION GRANTING MOTION TO**
**DISMISS FIRST AMENDED COMPLAINT**

This matter is before the Court on Defendants' Motion to Dismiss the Trustee's First

Amended Complaint.   [ECF Nos. 30 and 30-1 (memorandum in support, hereafter the

"Motion").]   In her First Amended Complaint [ECF No. 29 ("Amended Complaint")], Plaintiff

Phaedra Spradlin, chapter 7 trustee ("Trustee"), on behalf of debtor U.S. Coal Corporation ("U.S.

Coal") and its nine co-debtor subsidiaries,[1] asserts claims against Defendants Linda Whitt

---

[1] U.S. Coal's subsidiaries are: J.A.D. Coal Company, Inc., ("JAD"), Licking River Mining, LLC ("LR Mining"),
Licking River Resources, Inc. ("LR Resources"), S.M.&J., Inc. ("SM&J"), Fox Knob Coal Co., Inc. ("Fox Knob"),
Oak Hill Coal, Inc. ("Oak Hill"), Sandlick Coal Company, LLC ("Sandlick"), Harlan County Mining, LLC

("Linda"), Melissa Lewis ("Melissa"), and Stephanie Lacy ("Stephanie") (collectively "Defendants") in connection with the issuance of and payments made under promissory notes. Debtors seek to (a) subordinate or recharacterize Defendants' claims under § 510 of the Bankruptcy Code;[2] (b) avoid fraudulent transfers under chapter 5 of the Code and under Kentucky Revised Statutes §§ 378.010 and 378.020;[3] (c) avoid preferential payments under chapter 5 of the Code; (d) recover all avoided transfers; and (e) disallow Defendants' claims against the Debtors' estates.   Defendants move to dismiss the Amended Complaint in its entirety with prejudice under Civil Rule 12(b)(6), made applicable to adversary proceedings by Bankruptcy Rule 7012(b).   The Court having reviewed the record, heard the arguments of counsel, and being otherwise sufficiently advised, finds that Defendants' arguments are well-founded and, for the reasons set forth herein, will grant the Motion.

### JURISDICTION

The Court has jurisdiction over this adversary proceeding.   28 U.S.C. § 1334(b).   Venue is proper in this District.   28 U.S.C. § 1409.   This is a core proceeding.   28 U.S.C. § 157(b)(2)(F), (H).   Trustee pleads that this "is a 'core' proceeding to be heard and determined by the Court" and "the Court may enter final orders for matters contained herein."   [Am. Compl. ¶ 3.]   Defendants consent to the entry of final orders by this Court.   [ECF No. 33.]

---

("Harlan"), and U.S. Coal Marketing LLC ("Marketing").   U.S. Coal and the Subsidiaries are the "Debtors."

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. References to the Federal Rules of Bankruptcy Procedure appear as "Bankruptcy Rule ___," and references to the Federal Rules of Civil Procedure appear as "Civil Rule __."

[3] Effective as of January 1, 2016, chapter 378 of the Kentucky Revised Statutes was repealed, and Kentucky adopted the Uniform Voidable Transactions Act ("UVTA").   KY. REV. STAT. §§ 378A.005 to .140.   "No statute shall be construed to be retroactive, unless expressly so declared."   KY. REV. STAT. § 446.080(3).   The UVTA does not state that it is retroactive.   Therefore, the transfers at issue in this case occurring prior to the UVTA's enactment are subject to chapter 378, which was in effect at the time of the pertinent transfers.   Textual references to the Kentucky Revised Statutes hereafter shall appear as "K.R.S. § ___."

## PROCEDURAL HISTORY

Trustee filed a complaint commencing this proceeding on June 12, 2016.   The original complaint asserted ten counts against Defendants under the same legal theories in the Amended Complaint.   On August 9, Defendants moved to dismiss all of the claims in Trustee's original pleading under Civil Rule 12(b)(6).   After mediation did not resolve the matter, and rather than oppose the pending motion to dismiss, Trustee filed the Amended Complaint on October 19.   In response, Defendants moved to dismiss Trustee's amended pleading based on its failure to state viable claims against Defendants, raising the same arguments made in the original motion to dismiss, while also addressing a new claim plead in the Amended Complaint under § 510(c). Counsel argued the Motion on February 16, 2017.

## STANDARD OF REVIEW

Civil Rule 12(b)(6) contemplates a defense on the basis that a complaint "fail[s] to state a claim upon which relief can be granted."   FED. R. CIV. P. 12(b)(6).   Civil Rule 8, made applicable in adversary proceedings by Bankruptcy Rule 7008(a), requires "a short and plain statement of the claim showing that the pleader is entitled to relief."   FED. R. CIV. P. 8(a)(2).   In analyzing this pleading requirement in connection with a motion to dismiss, the United States Supreme Court has stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do' . . . . [n]or does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"   *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

As to each count, the Court must determine whether the Amended Complaint contains sufficient factual matter as to each element necessary to state a claim for relief that is plausible on its face.   The Court accepts all well-pleaded factual allegations in the Amended Complaint as true and construes them liberally in Trustee's favor.   *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citations omitted).   In evaluating whether the pleading states a plausible claim, the Court may consider the allegations in the pleadings, documents attached to or incorporated by reference in the pleadings, and adjudicative facts about which the Court may take judicial notice under Federal Rule of Evidence 201.   *Spradlin v. Pryor Cashman LLP (In re Licking River Mining, LLC)*, 565 B.R. 794, 801 (Bankr. E.D. Ky. 2017) (citations omitted).

## BACKGROUND AND FACTS ALLEGED IN THE AMENDED COMPLAINT AND ITS EXHIBITS

### I.    Defendants sold stock in SM&J to U.S. Coal as Part of a Series of Transactions that Created the U.S. Coal Family of Entities.

"U.S. Coal was formed in 2006 to use funds raised through various equity and debt issuances to acquire coal companies in the coal mining industry."   [Am. Compl. ¶ 25.]   U.S. Coal operated two subsidiary business groups called the Licking River Division and the J.A.D. Division.   The Licking River Division ("LRR Division")

> was formed through the acquisition of Debtors [LR Mining], [LR Resources], Oak Hill, and SM&J (collectively, the "Licking River Debtors") in January 2007 for approximately $33 million.   Of the $33 million of consideration paid for the stock of the LRR Division, $10 million was in the form of unsecured notes ("LR Seller Notes").   The sellers of the LRR Division to U.S. Coal included the Defendants [Linda, Melissa and Stephanie].   The LR Seller Notes are unsecured obligations of U.S. Coal.

[*Id.* ¶ 27.[4]]   Debtors produced and sold thermal and stoker coal.

Linda "was an owner of one of the Debtors and officer of" SM&J and "is married to John Whitt who is a former member of the U.S. Coal Board, principal equity holder and alleged lender

---

[4] U.S. Coal acquired the J.A.D. Division for about $29 million in April 2008.   [Am. Compl. ¶ 29.]

to" LR Mining. [*Id.* ¶ 22.] Stephanie is "a former owner of one or more of the Debtors," "daughter to John Whitt," and "married to William Christopher Lacy, Executive Vice President of" LR Resources. [*Id.* ¶ 23.] Melissa "was an owner of one of the Debtors and officer of [SM&J]," "daughter to John Whitt," and "had regular communication with employees of the Debtors." [*Id.* ¶ 24.]

Trustee attached certain executed and unexecuted transaction documents to her original complaint related to the LRR Division acquisition. [ECF Nos. 1-3 through 1-10.[5]] The documents reflect that, when the companies in the LRR Division were acquired, Defendants each owned an equity interest in SM&J; Linda owned 40.625%, Stephanie owned 6.25%, and Melissa owned 6.25%. [ECF No. 1-8.] The transaction documents do not reflect that Defendants owned equity interests in LR Mining, LR Resources, or Oak Hill when U.S. Coal acquired them.

U.S. Coal (then known as U.S. Coal Acquisition Corp. [ECF No. 1-11]) entered into a Stock Purchase Agreement as of October 24, 2006 (the "SPA") to acquire all of the stock of SM&J from its stockholders (including John Whitt, Linda, Stephanie, and Melissa) for $14,130,000.00. [ECF No. 1-8, ¶ 2.1.] Of this amount, $9,420,000.00 (less a hold-back) was paid at closing, and $4,710,000.00 was "payable in three annual installments pursuant to Promissory Notes." [*Id.*] The unsigned, undated "Form of Promissory Note" filed with the original complaint (and apparently attached to the SPA) reflected that the entire $4,710,000.00 note attributable to the acquisition of SM&J would be payable to John Whitt, though it stated at the top "*[Principal Amount to be allocated at closing among all SMJ Sellers]*." [ECF No. 1-9.]

Stock also transferred in the other direction under the SPA: "As additional consideration, [U.S. Coal Acquisition Corp.] shall deliver to the Sellers [defined to include

---

[5] The Amended Complaint states: "The Exhibits referenced herein are all attached to the original complaint [Adv. Doc. 1]." [Am. Compl. n.3.] The Court considers the Exhibits to be incorporated by reference and takes them into account in issuing this decision, as discussed herein.

Defendants] an aggregate of 470,000 shares (the "Acquired Shares") of Purchaser Common

Stock."   [ECF 1-8 ¶ 2.1.]   In other words, the SM&J shareholders (including Defendants)

collectively sold their shares in that entity via the SPA and also received stock in U.S. Coal

Acquisition Corp. (now known as U.S. Coal) under that same contract.   The Amended

Complaint, however, does not allege that Defendants owned any shares of U.S. Coal stock at any

time, nor do Trustee's claims appear to relate to Defendants' ownership of U.S. Coal stock.

## II.   Trustee Pleads in Confusing Fashion that Defendants "Forced a Repurchase of their Equity."

As stated above, well-pleaded factual allegations are accepted as true; however, the facts

alleged must be specific enough to be comprehensible both for a party to answer and for the

Court to apply a Civil Rule 12(b)(6) standard.   Trustee's Amended Complaint goes awry at

Paragraph 28, a paragraph that was not in her original pleading:

> 28.   Defendants became aware that their equity investment in the Debtors was becoming less valuable as the Debtors became further and further insolvent.   On information and belief, in order to monetize their equity investment, Defendants exercised their influence over the Debtors' officers to force a repurchase of their equity in the company by issuing debt in the form of the LR Seller Notes.   This transaction allowed the Defendants to gain access to a stream of debt repayments which they would not otherwise had access to had their investment remained in the form of equity.   Further, the transaction occurred as the Debtors' officers, including [Stephanie's] husband, were actively pitching investment bankers and other investors to provide the company with liquidity.   Indeed all other factors remaining equal, the transaction would have negatively impacted the Debtors' debt to equity ratios such that the investment would have increased the Debtors' cost of capital.   In sum, Defendants used the LR Seller Notes to rerecharacterize [*sic*] their investment in the Debtors from equity into debt, which provided Defendants financial liquidity to the detriment of the Debtors.

[Am. Compl. ¶ 28.]   This paragraph raises a number of questions that the Amended Complaint

never answers:

- When did Defendants' "awareness" occur?
- In which of the ten "Debtors" did Defendants own equity in at any given time?  Trustee's Exhibits reflect that Defendants owned interests only in SM&J when U.S. Coal acquired it.   They may have received equity interests in U.S. Coal upon the sale of their SM&J equity, but this is not plead.

6

- In connection with the crucial statement in Paragraph 28 — "to monetize their equity investment, Defendants exercised their influence over the Debtors' officers to force a repurchase of their equity in the company by issuing debt in the form of the LR Seller Notes" — it is impossible to determine (i) which "Debtors" are referenced, (ii) who "Debtors' officers" are alleged to be, (iii) which "company" is the one in which Defendants allegedly had equity that they exchanged for debt, (iv) the time frame for Defendants' unexplained acts to "exercise influence",[6] (v) how Defendants had "influence" over "Debtors' officers," (vi) how Defendants "exercised influence" over "Debtors' officers, and (vii) whether the alleged "forced repurchase" is a repurchase of SM&J stock, U.S. Coal stock, or some other entity's stock.

- With respect to the allegation that "Defendants used the LR Seller Notes to rerecharacterize [*sic*] their investment in the Debtors from equity into debt, which provided Defendants financial liquidity to the detriment of the Debtors," what does "rerecharacterize" mean?   Trustee defines the LR Seller Notes as having been issued in connection with U.S. Coal's initial acquisition of the LRR Division [Am. Compl. ¶ 27]; is Trustee claiming Defendants' "exercised their influence" by causing U.S. Coal to acquire the LRR Division?

Next, Paragraphs 34 and 35 require further speculation (as opposed to plausible inferences):

34.    Given their positions and/or relationships with the Debtors and their officers and directors, the Defendants had significant knowledge of the financial condition of the Debtors and their inability to pay their debts as they became due.

35.    At all times since U.S. Coal's acquisition of other Debtors and issuance of the LR Seller Notes, the Debtors had numerous unpaid creditors….

[Am. Compl. ¶¶ 34- 35.]   Which Debtors?   Which officers and directors?   When did Defendants have knowledge?   Which acquisitions?   Is Trustee alleging that Defendants' desire to obtain liquidity (because "Debtors" could not pay their debts when they came due) caused Defendants to sell their equity in SM&J to U.S. Coal via the SPA, or did they desire liquidity at some later date?

Trustee also provides what she claims to be the LR Seller Notes from U.S. Coal as borrower to each of Linda, Melissa, and Stephanie as holders.   [ECF No. 1-11, 1-12, 1-13.]

---

[6] In what may have been an attempt to clarify the time frame, Trustee alleges "the transaction occurred as the Debtors' officers, including [Stephanie]'s husband, were actively pitching investment bankers and other investors to provide the company with liquidity" [Am. Comp. ¶ 28], but this statement also does not establish the date on which the "forced repurchase" occurred.

None are signed.   Paragraph 27 asserts that the LR Seller Notes were issued when the LRR

Division was acquired in January 2007, and each tendered note states that it is issued pursuant to

the SPA, but each is labeled a "Fourth Amended and Restated Promissory Note" dated

September 30, 2009.   [ECF No. 1-11, 1-12, 1-13.]   Each note also states that it amends a "Third

Amended and Restated Promissory Note dated June 14, 2008."   [*Id*.]   Trustee does not provide

any prior notes that U.S. Coal issued as borrower to Defendants as holders, nor does she explain

how the "LR Seller Notes" she filed differ in any way from any such prior notes.

**III.    The Claims Plead in the Amended Complaint.**

Trustee seeks to recover all of the transfers, "which include the issuance of the LR Seller

Notes," from "the Debtors" to Defendants in the "Transfer Period."[7]   [Am. Compl. ¶ 37.]

"Specifically, the LR Seller Notes allowed the Debtors to transfer amounts not less than

$122,801.96 to [Melissa], $797,930.33 to [Linda,] and $122,801.96 to [Stephanie]."   [*Id*.]

Exhibit A to the Amended Complaint lists transactions with each Defendant (identified as

"Vendors").   Exhibit A identifies the "Company Name" as U.S. Coal and lists payments to each

Defendant, but Exhibit A does not expressly specify that U.S. Coal is the payor.   [ECF 1-1.]

Nevertheless, based on the Exhibit, it is plausible that U.S. Coal is the transferor.   Exhibit A

contains some specific information (including dates, amounts, and recipient) about "vendor

invoices" leading to "vendor payments" between December 2009 and December 2012,

presumably from U.S. Coal to Defendants, resulting in payments totaling the aforementioned

amounts.   Some line items on Exhibit A also reflect comments that appear to relate to the basis

for specific transfers (e.g., "interest," "LRR Sellers," "payment").

---

[7] Trustee defines the term "Transfer Period" in the Amended Complaint in a nonsensical way—as the time "[p]rior
to the Petition Date or the later date that a petition was filed against one of the Debtors."   [Am. Compl. ¶ 36.]   She
defines the "Petition Date" as May 22, 2014, the date of *LR Mining's* involuntary petition.   [*Id*. ¶ 5.]   Yet, the
Amended Complaint does not allege that LR Mining made even one transfer to any of the Defendants.

The Amended Complaint asserts eleven causes of action under the theories referenced

above.   At oral argument on the Motion, Trustee's counsel stated that Trustee would not pursue

Count IX (the preference avoidance claim under § 547) because Exhibit A reflected that

Defendants received no transfers after December 2012, taking all such payments outside of the

one-year reach-back period for recovery of insider preference payments in § 547.   The Court

therefore will not further discuss this cause of action herein, and deems it dismissed at Trustee's

request.   FED. R. BANKR. P. 7041 (incorporating FED. R. CIV. P. 41(a)(1)(A)(i)).   The remaining

counts are discussed below.

## LAW AND ANALYSIS

**I.      The Amended Complaint Fails to Plead a Plausible Basis to Support that
          Defendants' Claims may be Subordinated or Recharacterized as Equity.**

In Counts I and II, Trustee seeks to subordinate debts owed to Defendants arising from

the LR Seller Notes issued by U.S. Coal.   In addition, Trustee seeks to recharacterize

Defendants' claims of debt obligations owed by U.S. Coal as disguised equity via Count II.

**A.      Trustee has not asserted a plausible subordination claim against Defendants
          under Section 510(b).**

In Count I, Trustee seeks to subordinate Defendants' claims against U.S. Coal under the

LR Seller Notes based on § 510(b).   That section provides, in pertinent part:

> [A] claim arising from rescission of a purchase or sale of a security of the Debtor
> or of an affiliate of the Debtor, for damages arising from the purchase or sale of
> such a security, or for reimbursement or contribution allowed under section 502
> on account of such a claim, shall be subordinated to all claims or interests that are
> senior to or equal the claim or interest represented by such security, except that if
> such security is common stock, such claim has the same priority as common
> stock.

11 U.S.C. § 510(b).   Trustee does not contend that Defendants' claims related to the LR Seller

Notes either seek rescission in connection with the purchase or sale of a U.S. Coal security, or

reimbursement or contribution allowed under § 502 owing to such claims.   Thus, the sole

question is whether Defendants' claims against U.S. Coal are "for damages arising from the purchase or sale of" a security of U.S. Coal.    They are not.

Put simply, "[s]ection 510(b) mandates subordination of a claim for damages 'arising from' the purchase or sale of securities of the debtor." *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.)*, 272 B.R. 836, 841 (Bankr. D. Del. 2001), *abrogated on other grounds by Baroda Hill Inv., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir. 2002).    In other words, § 510(b) only applies to subordinate claims for damages that directly concern a transaction involving *a security of the debtor*, and the actual purchase or sale of the debtor's security must create the contested claim.    *Washington Bancorp. v. FDIC (In re Washington Bancorp.)*, Civil Action No. 95-1340 (RCL), 1996 U.S. Dist. LEXIS 3876, at *60 (D.D.C. Mar. 19, 1996) ("to invoke the subordination provision of section 510(b), WBC must allege that FDIC-C now asserts a claim 'for damages arising from the purchase or sale' of WBC's securities.").

In fact, the Amended Complaint does not allege that Defendants' claims against U.S. Coal relating to the LR Seller Notes are claims for damages arising from the purchase or sale of U.S. Coal securities.    The pleading alleges that (i) Defendants' claims arise out of the Stock Purchase Agreements related to the LRR Division, including the SPA for SM&J; (ii) U.S. Coal issued the LR Seller Notes in connection with the LRR Division acquisition; (iii) Defendants' claims "relate to payments for U.S. Coal's purchase of their stock" in SM&J; and (iv) "the common stock [in SM&J] purchased in connection with the LR Seller Notes constituted 'securities' within the meaning ascribed to such term by section 101(49) of the Bankruptcy Code."    [Am. Compl. ¶¶ 43, 44.]    Thus, the Amended Complaint does not allege that Defendants seek damages arising from the purchase or sale of a security *of* U.S. Coal.    Rather, the Amended Complaint alleges that Defendants' claims "arose from a purchase of a security *by*

U.S. Coal."   [*Id.* ¶ 45 (emphasis added).]   For this reason, based on its plain language, the

Amended Complaint fails to state a claim upon which relief can be granted under § 510(b).

Trustee's Response to this Motion [ECF No. 32 (the "Response") at 8-9] argues that the

LR Seller Notes constitute "securities" for purposes of her § 510(b) claim.   Although notes are

within the definition of a "security" under § 101(49), a leading bankruptcy treatise and

persuasive opinions from other federal courts explain that non-payment of promissory notes is

not a claim "for damages" in connection with the purchase or sale of a "security" in this context.

4 COLLIER ON BANKRUPTCY ¶ 510.04[6] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

("Of course, all claims of security holders are not subordinated under section 510(b).   For

example, claims of noteholders for payments required by the note, based upon the instrument

itself, are not claims 'for damages arising from the purchase or sale of such a security' and are

accordingly not subject to subordination under section 510(b)."); *see also Gernsbacher v.*

*Campbell (In re Equip. Equity Holdings, Inc.)*, Ch. 7 No. 09-38306-sgj-7, AP No. 11-03362-sgj,

2013 Bankr. LEXIS 1266, at *182-84 (Bankr. N.D. Tex. Mar. 28, 2013) (rejecting effort to

subordinate claims under promissory notes under § 510(b), citing Collier, *Montgomery Ward*);

*Wash. Bancorp.*, *supra*, 1996 U.S. Dist. LEXIS 3876, at *59-60 ("Section 510(b) prevents a

security holder from 'bootstrapping' an equity claim (subordinate to the claims of general

unsecured creditors) to general unsecured creditor status simply by alleging fraud, rescission, or

some other tort theory in the sale of the security.")).

Count I fails for multiple reasons.   Defendants' claims related to the LR Seller Notes are

claims to enforce those promissory notes.   In other words, Defendants have not asserted claims

"for damages" arising from the purchase or sale of a security of U.S. Coal.   In fact, Trustee

alleges that Defendants' claims stem from U.S. Coal's purchase of SM&J'S stock from

Defendants. Further, persuasive authority confirms that the LR Seller Notes are not "securities" within the scope of § 510(b) in this particular context.   Thus, Count I fails as a matter of law.

### B.    Trustee has not asserted a plausible equitable subordination claim against Defendants under Section 510(c).

"[U]nder principles of equitable subordination," a bankruptcy court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."   11 U.S.C. § 510(c)(1).   Trustee must establish that three conditions are met to warrant equitable subordination of Defendants' claims: (1) "[t]he claimant must have engaged in some type of inequitable conduct;" (2) "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;" and (3) "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act."   *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.*), 974 F.2d 712, 717–18 (6th Cir. 1992) (citations omitted); *see also Bayer Corp. v. MascoTech, Inc., (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 744 (6th Cir. 2001) (same).

Applying this three-part test, the Amended Complaint does not contain plausible factual averments that permit this Court to conclude that Trustee has alleged a claim against Defendants for equitable subordination.   Specifically, the Amended Complaint lacks well-pleaded factual allegations stating what "inequitable conduct" Defendants committed.

The Amended Complaint alleges that "Defendants, as creditors and equity holders of U.S. Coal through the LRR Division, engaged in inequitable conduct that harmed other creditors," and that "Defendants breached the fiduciary duty, as officers and controlling shareholders, to the detriment of U.S. Coal and for their own benefit and the benefit of other Defendants."   [Am. Compl. ¶ 50.]   These bare statements are "labels and conclusions" offered without factual support, and the Court may not take them as true.   *Iqbal*, 556 U.S. at 678-79.

With regard to the fiduciary duty contention specifically, the Amended Complaint pleads no facts regarding how the Defendants owed a duty to U.S. Coal, let alone how they breached such a duty.   For example, the Amended Complaint contains no well-pleaded facts to establish that Stephanie—a "former owner of one or more of the Debtors" who appears to have owned only a 6.25% interest in SM&J before signing the SPA—ever was an "officer" or a "controlling shareholder" of U.S. Coal.   While the SPA states that the sellers of SM&J's stock collectively would come to own 470,000 shares of U.S. Coal stock, Trustee does not allege that Stephanie ever came to own any of those shares, let alone a controlling interest in U.S. Coal.   Similarly, while the Amended Complaint states that Stephanie was an "equity holder[] of U.S. Coal through the LRR Division," it does not explain how Stephanie (who, it appears, only ever owned stock in SM&J) came to own equity in U.S. Coal via ownership of a "division."

The Amended Complaint also states that "Defendants exercised their influence over the Debtors' officers to force a repurchase of their equity in the company by issuing debt in the form of the LR Seller Notes."   [Am. Compl. ¶ 28.]   This is yet another "a 'naked assertion' devoid of 'further factual enhancement.'"   *Iqbal* at 678-79 (quoting *Twombly*, 550 U.S. at 555, 557). Paragraph 28 only generates unanswerable questions regarding Defendants' alleged "influence" over unspecified "officers," as set forth above.   Even assuming that Defendants somehow could exercise influence over John Whitt, who at some undefined point was a director of U.S. Coal, the Amended Complaint does not explain how John Whitt alone could have caused U.S. Coal to act.

As discussed earlier in the Court's review of Paragraph 28, the premise underlying Trustee's contention in the Amended Complaint that Defendants engaged in "inequitable conduct" is incomprehensible.   Trustee pleads that U.S. Coal was formed to acquire operating coal companies, such as SM&J and the other entities in the LRR Division, and does not allege that Defendants had any involvement in U.S. Coal's formation.   Trustee alleges that U.S. Coal

acquired and then operated the LRR Division—furthering the very intent Trustee asserts was

behind U.S. Coal's formation—and that U.S. Coal effected the acquisition by paying cash and

giving promissory notes to Defendants and others in accordance with the SPA, a written contract.

Then, Trustee contends that Defendants (who owned SM&J stock) exerted unexplained

"influence" over unnamed persons to compel U.S. Coal (an entity Trustee does not allege they

owned an interest in prior to U.S. Coal's acquisition of SM&J) to issue the LR Seller Notes as a

means to "rerepurchase" their equity in "the company" because they "became aware that their

equity investment in the Debtors was becoming less valuable as the Debtors became further and

further insolvent" and they wanted to "monetize their equity investment."   In short, this story is

incoherent.   Allowing this equitable subordination claim to proceed forward would force

Defendants to formulate a defense to an unintelligible claim.

    "[T]he Court 'need not feel constrained to accept as truth conflicting pleadings that make

no sense, or that would render a claim incoherent, or that are contradicted either by statements in

the complaint itself or by documents upon which its pleadings rely, or by facts of which the court

may take judicial notice.'"   *Miles v. Fed. Ins. Co.*, Civil Action No. 5:16-CV-15-KKC, 2017

U.S. Dist. LEXIS 19133, at *6 (E.D. Ky. Feb. 10, 2017) (quoting *Williams v. CitiMortgage, Inc.*,

498 Fed. App'x 532, 536 (6th Cir. 2012)).   The allegations relating to Count II fit this

description.   Trustee's failure to allege plausible factual statements of "inequitable conduct" by

Defendants is fatal to her claim for equitable subordination of Defendants' claims under the LR

Seller Notes.

    C.    **Trustee has not asserted a plausible recharacterization claim against
          Defendants.**

    Trustee also seeks to recharacterize Defendants' claims based on the LR Seller Notes via

Count II.   Under § 105, bankruptcy courts may recharacterize debt as equity in the Sixth Circuit

"where the circumstances show that a debt transaction was 'actually [an] equity contribution [ ]

14

*ab initio*.'"  *Autostyle*, 269 F.3d at 748 (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915

(Bankr. E.D. Va. 1997)).   "In a recharacterization analysis, if the court determines that the

advance of money is equity and not debt, the claim is recharacterized and the effect is

subordination of the claim 'as a proprietary interest because the corporation repays capital

contributions only after satisfying all other obligations of the corporation.'"   *Id*. at 749 (citation

omitted).   The Sixth Circuit instructs that courts should apply an eleven-factor test, with no

factor being controlling, to assess whether recharacterization is warranted:

> The factors are: (1) the names given to the instruments, if any, evidencing the
> indebtedness; (2) the presence or absence of a fixed maturity date and schedule of
> payments; (3) the presence or absence of a fixed rate of interest and interest
> payments; (4) the source of repayments; (5) the adequacy or inadequacy of
> capitalization; (6) the identity of interest between the creditor and the stockholder;
> (7) the security, if any, for the advances; (8) the corporation's ability to obtain
> financing from outside lending institutions; (9) the extent to which the advances
> were subordinated to the claims of outside creditors; (10) the extent to which the
> advances were used to acquire capital assets; and (11) the presence or absence of
> a sinking fund to provide repayment.

*Id*. at 749-50 (citing *Roth Steel Tube Co. v. Comm'r of Internal Rev.*, 800 F.2d 625, 630 (6th Cir.

1986).

"'[T]he more [a transaction] appears to reflect the characteristics of . . . an arm's length

negotiation, the more likely such a transaction is to be treated as debt.'"   *Id*. at 750 (citing *Cold

Harbor,* 204 B.R. at 915).   "[T]he paradigmatic situation for recharacterization [is] where the

same individuals or entities (or affiliates of such) control both the transferor and the transferee,

and inferences can be drawn that funds were put into an enterprise with little or no expectation

that they would be paid back along with other creditor claims."   *In re Adelphia Communs.

Corp.*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2016).

Defendants' Motion discusses each of the eleven *AutoStyle* factors, using the contents of

the Amended Complaint and its Exhibits to assess whether the LR Seller Notes should be

considered disguised equity.   [Mot. at 9-11.]   Defendants assert that all but factors (7) and (11)

above weigh in favor of Defendants' position that the LR Seller Notes were not disguised equity.
In response, Trustee argues that the *Autostyle* factors "are appropriately explored in a summary
judgement [*sic*] phase, not in the pleading stage."    [Resp. at 14.]    Trustee cites no law for this
proposition.    Trustee also makes no effort to show how her Amended Complaint pleads
anything more than a bare legal conclusion that the LR Seller Notes were disguised equity.

Courts may dismiss claims to recharacterize debt on a motion made under Civil Rule
12(b)(6).    "On a motion to dismiss, a complaint 'would have to plead facts to trigger the
applicability of the *AutoStyle* factors or their equivalent, or a meaningful subset of them' to avoid
dismissal."    *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 94 (Bankr.
S.D.N.Y. 2016) (quoting *Adelphia*, 365 B.R. at 75 n.216).    Trustee failed to demonstrate by
reference to her pleading how she alleged facts sufficient to "trigger the applicability of the
*AutoStyle* factors," and did not "address, by either allegations or argument, the showings that
need to be made under the caselaw for recharacterizing debt as equity."    *Adelphia*, 365 B.R. at
75.    Trustee's recharacterization claim is subject to dismissal for this reason alone.

Nevertheless, Trustee attached the LR Seller Notes and other Exhibits to her pleading,
which this Court may consider in resolving this Motion.    Taking into account the *AutoStyle*
factors, as well as what Trustee's pleading alleges and its Exhibits reflect, Trustee has not
plausibly alleged that the LR Seller Notes are disguised equity:

- The LR Seller Notes are denominated as promissory notes, and contain fixed maturity
  dates and interest rates.
- They required U.S. Coal to make repayments, and Trustee alleged that U.S. Coal made
  regular payments to each Defendant under their respective note (as evidenced by Exhibit
  A).
- The Amended Complaint does not assert that U.S. Coal was inadequately capitalized
  when it executed the LR Seller Notes—which it issued when buying multiple companies
  (comprising a new operating unit to further its alleged business strategy) for $33 million.

- While the SPA reflects that the SM&J shareholders, as a collective body, would receive U.S. Coal stock in connection with the sale of their shares, the Amended Complaint does not allege that Defendants ever came to own U.S. Coal stock.

- Trustee alleged that U.S. Coal had, and took steps to increase, outside financing, as she pled that U.S. Coal was formed in 2006 to "use funds raised through various equity and debt issuances" to acquire coal businesses, and purchased the LRR Division for $33 million while issuing notes to Defendants totaling a fraction of this sum at a time when "Debtors' officers … were actively pitching investment bankers and other investors to provide the company with liquidity."

- The LR Seller Notes say nothing about subordination of advances to the claims of outside creditors, and the Amended Complaint pleads that the notes were issued to pay Defendants for stock in SM&J, not to obtain funds to "acquire capital assets."

- The Amended Complaint fails to allege, via well-pleaded and non-conclusory factual allegations, that the LR Seller Notes did not stem from an arm's-length transaction.

- There is no suggestion that Defendants injected funds into U.S. Coal with little or no chance of repayment.

Looking only at the Amended Complaint and the Exhibits, Trustee has failed to state a claim for recharacterization upon which relief can be granted.

## II.    Because the Amended Complaint does not Satisfy the Trustee's Obligation to Plead that U.S. Coal Transferred Funds to Defendants with the Intent to Hinder, Defraud, or Delay Creditors, Trustee Fails to State a Claim for Actual Fraud.

Trustee seeks to avoid and recover funds paid to Defendants based on actual fraud via Counts III and VII.   Count III seeks avoidance of payments to Defendants "[o]n or within two (2) years before the Petition Date" under § 548(a)(1)(A) and § 550.   [Am. Compl. ¶ 53.]   Count VII seeks to avoid and recover payments made "prior to the filing of the involuntary bankruptcy petitions" under K.R.S. § 378.010 and §§ 544(b)(1) and 550(a)(1).   [*Id.* ¶ 81.]   "The heightened standard set forth in Civil Rule 9(b), made applicable to this adversary proceeding under Bankruptcy Rule 7009, applies to intentional fraudulent transfer claims where those claims are premised on a transferor-debtor's actual intent to defraud."   *Spradlin v. Pryor Cashman, LLP*, *supra*, 565 B.R. at 807 (citing *Gold v. Winget (In re NM Holdings Co., LLC)*, 407 B.R. 232, 260 (Bankr. E.D. Mich. 2009)).

17

To state a claim for avoidance under § 548(a)(1)(A), Trustee must allege: "(1) a transfer

of an interest of the debtor's property or the incurring of an obligation; (2) made on or within

[two years] of the petition date; and (3) with actual fraudulent intent."   *Scherer v. Quality*

*Communs., Inc. (In re Quality Communs., Inc.)*, 347 B.R. 227, 233 (Bankr. W.D. Ky. 2006).

Similarly, to state a claim under Kentucky's old fraudulent transfer statute, Trustee must allege

facts to support that Debtors made transfers to Defendants with an intent to delay, hinder, or

defraud creditors.   KY. REV. STAT. § 378.010.   Thus, to survive a Civil Rule 12(b)(6) motion,

Counts III and VII both require allegations supporting a plausible inference of the transferor's

intent to hinder, delay and defraud.

The Amended Complaint itself does not detail any transfer from any Debtor to any

Defendant.   Exhibit A to the Amended Complaint suggests that all challenged transfers to

Defendants originated from U.S. Coal.   The Amended Complaint alleges that U.S. Coal issued

the LR Seller Notes, and that these instruments resulted in all of the transfers to Defendants.

Therefore, Trustee has not stated a plausible claim that any Debtor other than U.S. Coal made

any potential fraudulent transfer to Defendants.

Trustee has filed several adversary proceedings in connection with these consolidated

chapter 7 cases involving claims for actual fraud, and in each case she has relied upon "badges of

fraud" to establish that Debtors had the intent to defraud creditors when making transfers.[8]   The

"badges of fraud" asserted in this case against Defendants are essentially identical to those

asserted in at least three other cases that this Court has overseen: *Spradlin v. Pryor Cashman*

---

[8] Trustee also argues in response to the Motion that Paragraph 28 of the Amended Complaint "explains that the LR
Seller Notes were a sham transaction so that Defendants could attempt to monetize their equity investment in the
Debtors."   [Resp. at 16.]   Trustee overstates the lucidity of her pleading.   Notably, it does not use the term "sham
transaction."   It also fails to allege facts that plausibly explain how U.S. Coal had an intent to hinder, defraud, or
delay creditors by issuing promissory notes to Defendants in exchange for stock Defendants owned in a separate
company.

LLP (*In re Licking River Mining, LLC*), AP No. 16-1031; *Spradlin v. Wrigley's 7-711, Inc. (In re Licking River Mining, LLC)*, AP No. 16-1034; and *Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, AP No. 16-1035.[9]   In each of these cases, in deciding motions to dismiss under Civil Rule 12(b)(6), the Court discussed the applicable law relating to each "badge of fraud" and why Trustee's alleged "badges of fraud" were ineffective as pled.   *Pryor Cashman*, 565 B.R. at 810-13; *Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, Ch. 7 No. 14-10201, AP No. 16-1035, 2017 Bankr. LEXIS 1039, at *30-38 (Bankr. E.D. Ky. Apr. 13, 2017); *Spradlin v. Wrigley's 7-711, Inc. (In re Licking River Mining, LLC)*, Ch. 7 No. 14-10201, AP No. 16-1034, 2017 Bankr. LEXIS 1726, at *25-32 (Bankr. E.D. Ky. June 21, 2017).

The same problems exist with Trustee's badges of fraud based on what is plead in the Amended Complaint in this case.   A full discussion of the problems with each badge will not further clarify them.   By way of just one example, with regard to the first alleged badge (transfers made between persons who are related, insiders, or who occupy a confidential relationship), as in *Monday Coal* and *Wrigley's*, Trustee pleads that Defendants are "insiders" based on connections to John Whitt.   *Compare Monday Coal*, 2017 Bankr. LEXIS 1039, at *31-32, *and Wrigley's*, 2017 Bankr. LEXIS 1726, at *25, *with* Am. Compl. ¶¶ 22-24, 38, 56, and 87 *and* Resp. at 19-20.   But, in all of these cases, Trustee conflates individuals with separately-organized corporate entities and fails to plead sufficient facts to support this badge-of-fraud theory.   John Whitt did not issue the LR Seller Notes or make any transfers referenced in the

---

[9] Trustee asserts that she plead the following badges of fraud: (a) transfers made between persons who are related, "insiders" or who occupy a confidential relationship; (b) transfers made with fictitious and/or false statements of consideration for the fraudulent conveyance; (c) transfers made by a debtor who transfers all or any appreciable part of his property when he is insolvent or "financially embarrassed;" (d) transfers made in anticipation of litigation or after suit has been brought; (e) transfers made to prefer one creditor's interest over others in order to hinder, delay or defraud the other creditors, such as in this case, where Defendants favored their own "insider" interests which hindered, delayed and defrauded its own legitimate creditors; and (f) inadequacy of consideration for the transfers. [Resp. at 19-20.]

Amended Complaint.   The Amended Complaint does not allege that John Whitt could compel

U.S. Coal to issue the LR Seller Notes or make any transfers.   The Amended Complaint also

does not identify the time period in which John Whitt was on the U.S. Coal board of directors, or

tie his service on the board to any specific transfer to any Defendant.

Trustee also alleges that Melissa has ties to Monday Coal, LLC, a creditor of "the

Debtors," and that Stephanie is married to an officer of LR Resources.   Neither allegation has

any bearing on whether badges of fraud exist in connection with U.S. Coal's transfers to these

Defendants as alleged in the Amended Complaint.   Neither tie affects whether Melissa or

Stephanie are related to U.S. Coal, are insiders of U.S. Coal, or enjoyed a confidential

relationship with U.S. Coal at the time of the challenged transfers.   Finally, none of Trustee's

allegations speak to *U.S. Coal's* intent when making even one transfer to Defendants.

The Amended Complaint does not plead either facts or badges of fraud necessary to form

a plausible basis from which U.S. Coal's requisite intent to hinder, defraud, or delay can be

inferred in connection with any alleged transfer to Defendants that could support Trustee's

claims in Counts III and VII.   Therefore, these counts fail as a matter of law.

### III.    The Amended Complaint Fails to State a Claim for Constructive Fraud against Monday.

Counts IV, V, VI, and VIII allege constructive fraud claims against Defendants under the

Code (§§ 548(a)(1)(B)) and Kentucky law (K.R.S. § 378.020, applicable through § 544) in

connection with payments made under the LR Seller Notes.[10]   The Amended Complaint fails to

plead plausible constructive fraud claims under federal and state law.

---

[10]  Trustee states early in the Amended Complaint that she seeks to avoid the issuance of the LR Seller Notes [Am. Compl. ¶ 37], but Counts IV, V, VI, and VIII only seek to avoid the transfer of funds paid in connection with the LR Seller Notes.   [*Id*. ¶¶ 37 (defining the term "Total Transfers"), 53-58, 60-65, 67-72, 86-90.]

"To state a claim to avoid constructively fraudulent transfers to and recover from [Defendants], Trustee must allege facts that plausibly show that the Debtor making a transfer, such as [U.S. Coal], received 'less than a reasonably equivalent value in exchange for such transfer[s]' (11 U.S.C. § 548(a)(1)(B)(i)) or that transfers were made 'without valuable consideration' (KRS § 378.020)." *Monday Coal*, 2017 Bankr. LEXIS 1039, at *41.   Trustee contends that she alleged that "value purportedly given by Defendants was not supported by adequate consideration."   [Resp. at 14 (citing Am. Compl. ¶¶ 33, 38, 86-88).]   None of these five cited paragraphs allege plausible, non-conclusory facts speaking to whether U.S. Coal received adequate or valuable consideration in exchange for the payments made to Defendants.[11] At best, one of these paragraphs echoes Trustee's contorted recharacterization argument that Defendants received "payment of equity and not debt."   [Am. Compl. ¶ 87.]

Trustee also disputes that Defendants received payments based on valid antecedent debt, arguing that "the LR Seller Notes were a sham transaction."   [Resp. at 15 (citing Am. Compl. ¶ 28).]   Again, no well-pleaded facts in the Amended Complaint support this conclusory statement.   As detailed above, the "new" paragraph added into the Amended Complaint, Paragraph 28, is incomprehensible.   Moreover, Trustee expressly alleged that Defendants received transfers as holders of promissory notes:

- "Of the $33 million of consideration paid for the stock of the LRR Division, $10 million was in the form of unsecured notes ('LR Seller Notes')."   [Am. Compl. ¶ 27.]
- "[T]he LR Seller Notes allowed the Debtors to transfer amounts not less than $122,801.96 to Lewis, $797,930.33 to L. Whitt and $122,801.96 to Lacy, as set forth in Exhibit A ("Total Transfer" and collectively, the "Total Transfers")."   [*Id*. ¶ 37 (emphasis removed).]

---

[11] For example, Paragraph 33 plainly says nothing about whether U.S. Coal's payments to Defendants arising from the LR Seller Notes—notes that U.S. Coal issued—were supported by adequate or valuable consideration: "Debtors U.S. Coal, Harlan County, Oak Hill, Sandlick, and Marketing, did not generate any revenue on their own. Debtors LRM, Licking River, SM&J, Fox Knob, and JAD did generate at least some revenue. Many of the Debtors that did generate revenue often paid the debts of other Debtors, and frequently the Debtor that made the payment did not receive any consideration on behalf of the payment."   [Am. Compl. ¶ 33.]

The Amended Complaint cites the SPA, which provides that U.S. Coal's predecessor would pay for Defendants' SM&J stock via the payment of cash and the issuance of promissory notes—financial instruments that require payment to the holder.   The LR Seller Notes tendered to the Court (unsigned) reference the SPA.

Nothing alleged within the four corners of the Amended Complaint supports Trustee's argument that she plausibly alleged that U.S. Coal did not make payments to Defendants owing to valid antecedent debt.   "Payment of valid antecedent debt, as a matter of law, is not a constructively fraudulent transfer as dollar-for-dollar reduction of indebtedness amounts to 'reasonably equivalent value' and 'consideration' under the pertinent statutes."   *Pryor Cashman*, 565 B.R. at 815 (citations omitted).   As a result, Trustee has not plead plausible constructive fraud claims in Counts IV, V, VI, and VIII.

**IV.     Counts X and XI Must be Dismissed as Trustee has not Stated a Basis upon which to Recover from Defendants or upon which to Disallow Defendants' Claims.**

Trustee seeks to recover from Defendants under § 550(a) in Count X, and to disallow Defendants' claims against Debtors under § 502(d) in Count XI, to the extent transfers to Defendants are avoided via Counts I through IX.   Trustee's ability to succeed under either Count depends upon her success on Counts I through IX, each of which fails to state a claim on which relief can be granted, as set forth above.   Thus, Counts X and XI also fail.

**V.     Leave to Amend Will Not Be Granted.**

The final question relating to this Motion is whether Trustee may further amend her pleading.   The Court, in very similar procedural circumstances, refused to grant Trustee leave to amend in *Pryor Cashman*, *Monday Coal*, and *Wrigley's*, and the same reasons not to grant leave to amend exist here.   As in the other three adversary proceedings, the Court concludes that Trustee's failure to address the deficiencies in her original complaint, despite ample time to do so, reflects either that Trustee did not take the steps necessary to proceed with her claims in good

faith or that permitting additional amendment would be futile.   Therefore, Trustee will not be given leave to file a second amended complaint.

<u>**CONCLUSION**</u>

For the reasons stated herein, Defendants' Motion to Dismiss [ECF No. 30] will be GRANTED.   A separate order will be entered in conformity herewith.

23

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
_**Tracey N. Wise**_
**Bankruptcy Judge**
**Dated: Thursday, June 29, 2017**
**(tnw)**